**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

**The Honorable Judge Elizabeth E. Brown**

| | | |
|---|---|---|
| In re: | ) | Bankruptcy Case No. 20-15060 EEB |
| | ) | |
| | ) | Chapter 7 |
| SUSAN AMINA ELIYA | ) | |
| SS# xxx-xx-3797 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| KIP KORTHUIS, as an individual, and on | ) | |
| behalf of PEAK PROPERTY GROUP, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUSAN AMINA ELIYA | ) | |
| | ) | |
| Defendant | ) | |

_____

**KIP KORTHUIS AND PEAK PROPERTY GROUP, LLC'S**
**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**
**PURSUANT TO 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(4)**
_____

COMES NOW, Kip Korthuis ("Korthuis"), on behalf of himself and Peak Property

Group, LLC ("Peak")(collectively, "Peak Creditors"), bring this adversary proceeding pursuant

to 11 U.S.C. §523(a)(2)(A), 11 U.S.C. §523(a)(4), §553, and Bankruptcy Rule 4007 seeking an

order determining the dischargeablity of the debt owed to the Peak Creditors by Susan Amina

Eliya  (the "Debtor" or "Eliya").

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334,

and 11 U.S.C. § 523.

1

2.      Venue in the District of Colorado is proper under 28 U.S.C. § 1409(a).

3.      This is an adversary proceeding to determine the dischargeability of a debt pursuant to Bankruptcy Rules 4007 and 7001(6).  This court has jurisdiction pursuant to title 28 U.S.C.A. § 157(b)(J).

## THE PARTIES

4.      On July 27, 2020, the above-named debtor, Susan Amina Eliya, filed a petition for relief under Chapter 7 of title 11, United States Code.

5.      Debtor is indebted to Peak Creditors in the sum of $850,000 plus applicable interest, statutory treble damages, and attorney fees and costs, and said debt is founded upon a claim which is excepted from a discharge in bankruptcy.

6.      Eliya is the debtor in the Bankruptcy Case now pending before this Court.

## BACKGROUND and GENERAL ALLEGATION

7.      Peak was established in May 2012 by Juan Crespin ("Crespin").  Crespin is Eliya's husband.

8.      Peak is a Colorado limited liability company.

9.      On or about March 4, 2015, ownership of Peak changed from Crespin to Korthuis and Eliya.

10.      On or about March 4, 2015, with the express consent and encouragement of Crespin, Korthuis and Eliya decided to become business partners.

11.      On March 4, 2015, Eliya became a 51% member of Peak and Korthuis became a 49% member of Peak.

12.      As part of the initial 2015 deal between Korthuis and Eliya, Korthuis and his brother, Mr. Kim Korthuis, contributed five residential homes into the Peak business.

2

13.     The following is a breakdown of the properties contributed to Peak by Korthuis in 2015 and their current status:

a.  4717 E. Washington Las Vegas, Nevada 89110.  This property was sold by Peak but the amount of sales proceeds is currently unknown.  Despite a prior agreement to the contrary, none of these proceeds were used to benefit Peak or used to pay Korthuis.

b.  5659 Moapa Ct. Las Vegas, Nevada 89110.  Upon information and belief, said real property was sold on or about January 30, 2016 by Peak with sale proceeds being approximately $15,015.98.  Despite a prior agreement to the contrary, none of these proceeds were used to benefit Peak or used to pay Korthuis.

c.  6116 Granada Cir. Las Vegas, Nevada 89107.  Upon information and belief, said real property was sold on or about January 8, 2016 by Peak with sale proceeds being approximately $105,322.24.  Despite a prior agreement to the contrary, none of these proceeds were used to benefit Peak or used to pay Korthuis.

d.  3562 Tokyo Ct., Las Vegas, Nevada 89115.  Upon information and belief, said real property was sold on or about February 16, 2016 by Peak with sale proceeds being approximately $6,853.20.  Despite a prior agreement to the contrary, none of these proceeds were used to benefit Peak or used to pay Korthuis.

e.  1126 43rd St. Orlando, Florida 32839.  Upon information and belief, said property was sold on or about November 4, 2016 by Peak with sale proceeds being approximately $93,626.35.  Despite a prior agreement to the contrary, none of these proceeds were used to benefit Peak or used to pay Korthuis.

3

14.     Green Star Rising, Inc. ("Green Star") is a Nevada corporation with a principal street office address in Denver County, Colorado.  Green Star is or was owned by Crespin and Debtor Eliya.

15.     As part of said 2015 deal outlined herein in Paragraph 10, Eliya and/or Crespin and/or Green Star and/or the business partners of Eliya and Crespin also contributed residential properties to Peak.

16.     As part of the initial 2015 deal between Korthuis and Eliya, Kim Korthuis, the brother of Plaintiff Korthuis, loaned Peak $276,135.00.

17.     Said money was to be paid back by Peak at an annual return of 6% interest.  Said money was to be used for purposes that benefited Peak.

18.     Kim Korthuis received the first two payments from Peak on July 1, 2015 and October 1, 2015.  Default interest under the note is 12%.

19.     Despite demands by Kim Korthuis, no payments on said promissory note have ever been made by Peak to him after these first two payments.

20.     Upon information and belief, at the specific direction of Eliya, much of this money was fraudulently transferred to Eliya and or many of the entities owned by Eliya and/or her husband Crespin.

21.     Similarly, said funds were also used to pay the creditors of Eliya and/or Crespin (and/or their related entities) that had no connection with Peak.

22.     None of this conduct was authorized by Korthuis.

23.     As part of the initial 2015 deal between Korthuis and Eliya, B2R Finance L.P. ("B2R") loaned Peak $700,000.00 to be used for purposes that benefited Peak.

24.     These funds were provided to Peak on or about March 20, 2015.

25.     Korthuis signed loan documents after being expressly promised by Eliya and Crespin that said funds would be used to benefit Peak.

26.     Upon information and belief, at the specific direction of Eliya and/or Crespin, unfortunately, much of this money was fraudulently transferred to the Eliya and/or the entities owned by her and/or Crespin.

27.     These funds were also used to pay the creditors of Eliya and/or Crespin (and/or their related entities) that had no connection with Peak.

28.     None of this conduct was authorized by Korthuis.

29.     As part of the initial 2015 deal between Korthuis and Eliya, Korthuis, through his IRA account, loaned Peak $168,000.00 and $72,000.00.  Said money was to be paid back by Peak at an annual return of 5% interest.  The maturity date of said loans was April 3, 2017.  Said money was to be used for purposes that benefited Peak.

30.     Despite demands by Korthuis, no payments on said loans have ever been made by Peak.

31.     Upon information and belief, instead of benefiting Peak, unfortunately, said money has been used to benefit Eliya. Similarly, said funds were also used to pay the creditors of Eliya and/or Crespin (and/or their related entities) that had no connection with Peak.

32.     None of this conduct was authorized by Korthuis.

33.     Upon information and belief, instead of benefiting Peak, however, said money has been used to benefit the Eliya and/or Crespin and/or their related entities.

34.     As of the date of the filing of this Complaint Peak still currently owns the following real property:

    a.   2700 S. Holly St. #112, Denver, Colorado 80222

    b.   2700 S. Holly St. #221, Denver, Colorado 80222

    c.   52355 Avenida Rubio, La Quinta, California 92253

    d.   54830 Avenida Obregon, La Quinta, California 92253

35.      One of the main complications with said properties still owned by Peak is that Eliya has encumbered said properties with liens that have no connection to Peak.

36.      In the Fall of 2017, Korthuis first began noticing that Eliya, seemingly, was misappropriating/misusing the real property and monies of Peak.

37.      What gave rise to Korthuis' suspicion, specifically, was Eliya's failure to make payments to Kim Korthuis pursuant to his aforementioned promissory note and the failure of a payment by Peak on said B2R loan.

38.      Before the Fall of 2017, Korthuis had absolutely no knowledge that Eliya was misappropriating/misusing the real property and monies of Peak.

39.      Korthuis filed a lawsuit in Denver District Court, Case No. 2018CV034332 in November 2018. This action was later transferred to the Judicial Arbiter Group for an arbitration that currently is still pending, but stayed.

40.      Since the initial filing of this lawsuit in November 2018, Korthuis has learned more about the whereabouts of funds/property that were supposed to be used for the benefit of Peak. Most of this knowledge was gleaned from the depositions of Eliya and/or Crespin that took place in the Fall of 2019.

41.      In connection with Korthuis' concerns arising in the Fall of 2017, on November 21, 2017, Korthuis had his attorney, Adam O'Rourke, Esq., write a cease and desist letter to Eliya which requested, among other things, that Eliya should refrain from performing any work for Peak without Korthuis' involvement and approval.

42.     Eliya did not comply with Korthuis' demand to cease and desist performing work and, instead, started trying to sell off all of Peak's assets as quickly as possible with the specific intention to defraud Korthuis.

43.     Among other things, Korthuis learned that Eliya has been, without legal authorization, paying significant amounts of Peak's monies to entities unrelated to Peak and related to Eliya and/or Crespin including, without limitation, payments to Eliya individually, payments to Green Star (an entity owned by Eliya and Crespin), payments to JSC Property Group, LLC ("JSC") (an entity currently owned by Eliya and that used to be owned by Crespin), payments to Crespin (the husband of Eliya), payments to SoCal Sun, Inc. ("SoCal") (an entity owned by Eliya and Crespin), payments to Revest Capital, LLC ("Revest") (an entity owned by Crespin), and payments to Titan Fund IX, LLC ("Titan") (an entity owned by Crespin).

44.     Irma Martinez ("Martinez") is an individual with a residential address of 160 Harris Drive, Austin, Texas 78737.

45.     Martinez previously filed a lawsuit against Eliya, care of the Burris Law firm; 200 N. Tustin Ave., Suite 110, Santa Ana, California 92705.

46.     Korthuis also recently learned that Eliya fraudulently entered into a settlement agreement with Martinez whereby the agreement was secured by a property owned by Peak.  Said payments/conduct did not benefit Peak.

47.     By way of example, a few examples of said fraudulent payments include, without limitation, as follows[1]:

---

[1] Please note that the fraudulent payments made to the defendants are extensive and, for sake of brevity, Plaintiffs are unable to reproduce them all here.  However, the payments are significantly detailed in the deposition exhibits from this case that have already been produced to counsel for Eliya.

e.  March 20, 2015 - $168,000.00 payment to Green Star Rising, Inc.

f.  March 20, 2015 - $57,800.00 payment to Green Star Rising, Inc.

g.  April 17, 2015 - $37,500.00 payment to Green Star Rising, Inc.

h.  April 22, 2015 - $31,800.00 payment to Green Star Rising, Inc.

i.  May 1, 2015 - $1,338.96 payment to Juan Crespin

j.  May 12, 2015 - $2,000.00 payment to Eliya's personal credit card

k.  May 12, 2015 - $2,000.00 payment to Eliya's personal credit card

l.  February 5, 2016 - $1,000.00 payment to Eliya's personal credit card

m.  February 23, 2016 - $1,000 payment to Eliya's personal credit card

n.  February 25, 2016 - $3,500.00 payment to Eliya's personal credit card

o.  February 29, 2016 - $30,000.00 payment to JSC Property Group, LLC

p.  March 9, 2016 - $25,000.00 payment to JSC Property Group, LLC

q.  June 27, 2016 - $300.00 payment to Juan Crespin

r.  A 2016 loan from Peak to Green Star Rising Inc. in the amount of $302,200.00 that has never been paid back

s.  April 18, 2017 - $5,000.00 payment to Green Star Rising, Inc.

t.  September 7, 2017 - $4,000.00 payment to Eliya

u.  May 8, 2018 - $8,800.00 payment to Green Star Rising, Inc.

48.     Upon information and belief, and without authorization, Eliya and Crespin were also frequently using Peak funds for their own personal expenses including for food, gas, and personal travel.

49.     Korthuis has also recently learned that Eliya and Crespin were fraudulently transferring Peak funds to Green Star and then Green Star would distribute said funds to Eliya and her related entities.

50.     By way of example, a few examples of said fraudulent payments include, without limitation, as follows[2]:

v.  Upon information and belief, 2755 N. Grove St., Denver, Colorado 80211 was purchased on April 7, 2016, at least in part, with funds that were taken from Peak and/or from loans secured by Peak property.  Similarly, upon information and belief, improvements on said real property were paid for, at least in part, with funds that were taken from Peak and/or from loans secured by Peak property.

w.  Starting on March 27, 2015 through 2019, Green Star has paid Crespin approximately $177,525.94 with funds that, at least in part, were taken from Peak.

x.  Green Star has also used Peak properties as security for loans made to it, including without limitation the David Hou loan that is described in greater detail below.

51.     When Korthuis first learned about the misappropriation of Eliya, Korthuis demanded thorough accounting information from Eliya relating to said payments and loans, among other things.

---

[2] Please again note that the fraudulent payments made to the defendants are extensive and, for sake of brevity, Plaintiffs are unable to reproduce them all here.

52.     To date, Eliya has refused to provide an accounting and has only offered vague explanations.

53.     Eliya produced some financial documents but many relevant documents remain undisclosed.

54.     Eliya continues to conceal relevant financial documents so that Peak Creditors are unable to understand the full nature and extent of her fraudulent scheme.  Eliya and Crespin are also failing to disclose substantial income on tax returns in an effort to further evade detection by Korthuis.

55.     One of the recent discoveries of Eliya's unauthorized uses of monies directly lead to Korthuis emailing Eliya on January 9, 2018.  In said email, Korthuis stated: "Please stop removing any money from our Peak account without my permission, effective immediately."

56.     Despite making this demand, Eliya has not complied with the request of Korthuis to stop removing money from the Peak account.

57.     Eliya, on behalf of Peak, also engaged in an extensive fraudulent scheme by utilizing Peak assets to secure loans for real estate projects that did not benefit Peak.  Indeed, during Korthuis' investigation in the Fall of 2017, Korthuis discovered that Eliya had been encumbering properties owned by Peak with encumbrances that were unrelated to the business of Peak and not for the benefit of Peak.  Such encumbrances include, without limitation, a deed of trust granted in favor of Irma Martinez that encumbers 54830 Avenida Obregon La Quinta, California 92253.

58.     Said deed of trust was recorded on November 9, 2015 at Reception No. 2015-0491819 in the official records of Riverside County, California.

59.     Upon information and belief, the money loaned by Irma Martinez went to Green Star Rising, Inc. and not to Peak and, yet, the lien still encumbers Peak real property.

60.     In a face-to-face meeting that occurred between Eliya and Korthuis on or around January of 2018, Eliya admitted that said lien should not be encumbering 54830 Avenida Obregon La Quinta, California 92253 because it did not benefit Peak.

61.     5xR, LLC ("5xR") is a Colorado limited liability company with a principal street office address in Denver County, Colorado.

62.     Upon information and belief, 5xR has been the fraudulent transferee of a significant amount of funds that should have been used for the benefit of Peak.

63.     Similarly, after November 2018 Denver District Court litigation was filed, Korthuis learned that 5xR fraudulently recorded a deed of trust purportedly encumbering 2700 South Holly Street #112, Denver, Colorado 80222 (a property owned by Peak) in the amount of $50,000.00; Irma Martinez was fraudulently granted a deed of trust against 2700 South Holly Street #112, Denver, Colorado 80222 in the amount of $100,000.00; 5xR fraudulently recorded a deed of trust against 2700 South Holly Street #221, Denver, Colorado 80222 (a property owned by Peak) in the amount of $50,000.00; and Irma Martinez was fraudulently granted a deed of trust against 2700 South Holly Street #221, Denver, Colorado 80222 in the amount of $100,000.00.

64.     Similarly, after the Denver District Court litigation was filed, Korthuis also learned that David Hou was also fraudulently granted a deed of trust against a Peak owned property.

65.     During his investigation in early 2018, Korthuis also discovered that Peak loaned money to JSC, another entity owned by Eliya.

66.     Korthuis never knew about or authorized these loans.

67.     Upon information and belief, said loans to JSC were not for the benefit of Peak and these loans have never been repaid thereby damaging Peak significantly.

68.     One of the loans made by Peak to JSC was secured by a mortgage that encumbered 7637 S. Laflin St., Chicago, IL 60620.

69.     After the filing of the Denver District Court litigation, Eliya, on behalf of JSC, quickly sold said real property to evade any ability of Korthuis to collect.

70.     When said real property was sold on November 7, 2018, a satisfaction of mortgage was recorded; and filed by Eliya but no money was ever paid to Peak to repay its loan to JSC. Such conduct has damaged Peak Creditors.

71.     During his investigation in early 2018, Korthuis also discovered that Eliya had petitioned for bankruptcy in 2018.

72.     The bankruptcy proceeding was a Chapter 13 proceeding, Bankruptcy Case No. 18-12620 EEB with Judge Elizabeth E. Brown.

73.     This proceeding was dismissed by Order of the Court on April 19, 2018.

74.     Eliya never informed Korthuis about petitioning for bankruptcy.

75.     In 2018, Korthuis also learned that Peak has been sued in California by an alleged lender Irma Martinez in a lawsuit.

76.     Eliya never told Korthuis about this lawsuit and Korthuis had no knowledge about this lawsuit.

77.     Korthuis did not know that Martinez ever loaned Peak money, in any amount.

78.     In connection with this lawsuit, a lis pendens was also recorded clouding title to Peak's California properties.

79.     In November 2018, Korthuis learned that Eliya was attempting to sell 2700 S. Holly #221, Denver, Colorado 80222; 2700 S. Holly #112, Denver, Colorado 80222; 52355 Avenida Rubio, La Quinta, California 92253; and 54830 Avenida Obregon, La Quinta, California 92253.

80.     Eliya never told Korthuis anything about her efforts to sell these properties.

81.     Eliya was trying to sell said properties to evade the collection efforts of Korthuis.

82.     In 2018, Korthuis also learned that Eliya had been changing Peak's Bank of the West bank account statements and using the doctored statements to people as a proof of funds letter.

83.     Korthuis further learned that the doctored statements were likely derived from bank statements from another bank account of Eliya and/or one of Eliya's entities.

84.     Korthuis never approved of said conduct.

85.     In short, upon information and belief, Eliya has fraudulently misrepresented the use of Peak funds and Peak real property to Korthuis.

86.     Simply put, Eliya has intentionally used Peak funds to pay her other companies, and/or to pay herself and Crespin and/or to pay off debts that were unrelated to the business of Peak.

87.     As Manager of Peak, Eliya also has been using real property owned by Peak as security for loans that had no relationship with Peak and did not benefit Peak.  Instead, these unauthorized loans benefited the Eliya and her entities.

88.     None of this conduct by Eliya and Crespin was approved by or even told to Korthuis and some of this conduct occurred after Manager Korthuis specifically told Eliya to cease and desist such conduct and/or after the filing of this lawsuit.

89.     Upon information and belief, Eliya is running this same scam with other investors across the country.

90.     No monies have been paid to Korthuis since his investment in Peak.  Payment to Korthuis is due and owing.

91.     Korthuis has, on numerous occasions, attempted to stop Eliya from performing acts that are against the interest of Peak.

92.     Eliya refuses to comply with the demands of Korthuis.

93.     All conditions precedent for this lawsuit have been satisfied by the Peak Creditors.

94.     On or about June 11, 2020, Eliya transferred all of her ownership interest in Peak to Korthuis.

95.     Korthuis is now the 100% owner of Peak.

**COUNT I: OBJECTION TO DISCHARGE OF DEBT**
**PURSUANT TO 11 U.S.C. § 523(a)(4)**
**Civil Theft**

96.     Peak Creditors restate and reallege Paragraphs 1 through 95 above as set forth herein.

97.     Under 11 U.S.C. § 523(a)(4), an individual debtor may not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

98.     Upon information and belief, the Eliya knowingly obtained control over cash and real property belonging to Peak.

99.     Said cash and real property was transferred to the Eliya for no consideration and/or for inadequate consideration.

100.    Eliya exerted dominion and control without authorization and intended to deprive Peak Creditors permanently of the benefit of the assets and revenue of Peak that were taken by Eliya.

101.    Upon information and belief, the actions of Eliya has diminished the value of Peak and the membership interest of Korthuis.

102.    As a result of the conduct of Eliya, Peak Creditors have suffered damages.

103.    Pursuant to 11 U.S.C. § 523(a)(4) and C.R.S. § 18-4-405, Peak and/or Korthuis are entitled to recover all stolen funds, plus the costs of this action, attorneys' fees, and treble damages against Eliya.

104.    This claim was already asserted in Denver District Court, Case No. 2018CV034332.

## COUNT II: OBJECTION TO DISCHARGE OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(4): Breach of Duty of Good Faith and Fair Dealing

105.    Peak Creditors restate and reallege Paragraphs 1 through 104 above as set forth herein.

106.    Eliya, as Peak's Manager, was obligated to exercise her rights and duties in accordance with her obligation to Peak to act with good faith and deal fairly.

107.    Under 11 U.S.C. § 523(a)(4), an individual debtor may not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

108.    Eliya has breached her duties for several reasons, including but not limited, to:

I.      Failing to account for transfers of cash out of Peak;

II.     Misrepresenting debits made to the Peak bookkeeper;

III.     Representing Peak and another entity simultaneously in business deals where there is a clear conflict of interest;

IV.     Concealing the true financial condition of Peak from Korthuis;

V.     Using Peak money for her own personal expenditures and/or using Peak money for the benefit of Eliya;

VI.     Failing to cause Peak to timely re-pay Korthuis for his loans provided to Peak;

VII.     Failing to have proper paperwork for loans made to insider companies and family members;

VIII.     Failing to cease and desist real estate transactions and money transfers after being asked to cease and desist by Korthuis;

IX.     Using Peak real property to secure loans made for the benefit of the Eliya; and

X.     Transferring cash to insider companies and family members without an exchange of reasonably equivalent value.

109.     As a proximate result of said breaches, Peak Creditors have suffered damages.

110.     This claim was already asserted in Denver District Court, Case No. 2018CV034332.

## COUNT III: OBJECTION TO DISCHARGE OF DEBT
## PURSUANT TO 11 U.S.C. § 523(a)(4)
### Breach of Duty of Care

111.     Peak Creditors restate and reallege Paragraphs 1 through 110 above as set forth herein.

112.    Under 11 U.S.C. § 523(a)(4), an individual debtor may not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

113.    Eliya, as Manager of Peak, owed the company a duty of care, which included refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law.

114.    Upon information and belief, Eliya recklessly and/or intentionally exerted control over the assets of Peak for her own personal gain.

115.    In doing so, Eliya failed to provide any value for the cash and real property transferred out of Peak, to the detriment of Peak Creditors.

116.    Eliya breached her duty of care to Peak and its members, including Korthuis.

117.    Eliya's actions were willful and wanton.

118.    As a proximate result of Eliya's actions, the Peak Creditors have been damaged.

119.    This claim was already asserted in Denver District Court, Case No. 2018CV034332.

### COUNT IV: OBJECTION TO DISCHARGE OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(4) Recovery of Stolen Property

120.    Peak Creditors restate and reallege Paragraphs 1 through 119 above as set forth herein.

121.    Under 11 U.S.C. § 523(a)(4), an individual debtor may not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

122.    Upon information and belief, the Eliya received transfers of funds stolen from Peak.

123.    Peak Creditors are entitled to recover these funds, plus the costs of the action, attorneys' fees, and treble damages.

124.    This claim was already asserted in Denver District Court, Case No. 2018CV034332.

## COUNT V: OBJECTION TO DISCHARGE OF DEBT
## PURSUANT TO 11 U.S.C. § 523(a)(4)
## Recovery of Property and/or Value Thereof

125.    Peak Creditors restate and reallege Paragraphs 1 through 124 above as set forth herein.

126.    Under 11 U.S.C. § 523(a)(4), an individual debtor may not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

127.    Monies/assets of Peak Creditors were fraudulently transferred to Eliya and said transfers are clearly fraudulent, suspect, lacking innocence and integrity.

128.    Eliya's actions with regard to these transfers were made with the actual intent to hinder, delay, or defraud the Peak Creditors.

129.    Among other things, Eliya has used these ill begotten gains to pay off unrelated debts, pay personal expenses and, upon information and belief, to pay for the purchase of and/or to improve other real property including without limitation real property located at 2755 N. Grove St., Denver, Colorado 80211.

130.    Said Grove St. property is implicated in Eliya's fraudulent scheme and Plaintiffs are entitled to numerous remedies that impact title to said Grove St. property.

131.    In short, Eliya's actions are fraudulent and the Peak Creditors are entitled to all available remedies including avoidance of the transfer, setting aside the transfer, attachment, an injunction against further disposition by the respective defendant of the respective property, real or personal, to levy execution on the subject property or its proceeds, as well as a judgment for

one and one-half the value of the subject property transferred or for one and one-half the amount necessary to satisfy the Plaintiffs' claim, whichever is less, together with the creditor's actual costs.

132.    This claim was already asserted in Denver District Court, Case No. 2018CV034332.

## COUNT VI: OBJECTION TO DISCHARGE OF DEBT
## PURSUANT TO 11 U.S.C. § 523(a)(2)(A)
### Fraud

133.    Peak Creditors restate and reallege Paragraphs 1 through 132 above as set forth herein.

134.    Under 11 U.S.C. § 523(a)(2)(A), an individual debtor may not discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

135.    Eliya made false representations to Korthuis before Korthuis contributed real property and money to Peak.

136.    The representations made by Eliya were material.  Indeed, Eliya represented to Korthuis that his personal loans, the B2R loan, and Korthuis' real property that he contributed to Peak would be used to benefit Peak and that Korthuis would make money on this investment.

137.    At the time the representations of Eliya were made, she knew that her representations were false.

138.    Eliya made said representations with the intent that Korthuis would rely on the representations.

139.    Korthuis reasonably relied on the representations of Eliya.

140.    Korthuis' reliance was justified.

141.     Korthuis' reliance has proximately caused damages to Korthuis.

142.     This claim was already asserted in Denver District Court, Case No. 2018CV034332.

## COUNT VII: OBJECTION TO DISCHARGE OF DEBT
## PURSUANT TO 11 U.S.C. § 523(a)(2)(A) and/or 11 U.S.C. § 523(a)(4),
## Civil Conspiracy

143.     Peak Creditors restate and reallege Paragraphs 1 through 142 above as set forth herein.

144.     Under 11 U.S.C. § 523(a)(4), an individual debtor may not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

145.     Under 11 U.S.C. § 523(a)(2)(A), an individual debtor may not discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

146.     Eliya intentionally agreed, by words or conduct, to accomplish the unlawful goal of fraudulently transferring the cash and property of Peak Creditors after making representations to the contrary to Korthuis.

147.     An agreement was reached between Eliya and her entities and Crespin that they would take the investments of Korthuis and/or the monies of Peak and utilize said monies for the benefit of Eliya personally.

148.     This fraudulent scheme was not communicated to Korthuis.

149.     As set forth above, Eliya took numerous actions in furtherance of this agreed upon fraudulent goal.

150.     Said conduct has proximately damaged the Peak Creditors.

151.    The Peak Creditors are entitled to damages, as the injury complained of herein is attended by circumstances of fraud, malice, or willful and wanton conduct.

152.    This claim was already asserted in Denver District Court, Case No. 2018CV034332.

### COUNT VIII: OBJECTION TO DISCHARGE OF DEBT
### PURSUANT TO 11 U.S.C. § 523(a)(4) and/or 11 U.S.C. § 523(a)(2)(A)
### Piercing the Corporate Veil

153.    Peak Creditors restate and reallege Paragraphs 1 through 152 above as set forth herein.

154.    Under 11 U.S.C. § 523(a)(4), an individual debtor may not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

155.    Under 11 U.S.C. § 523(a)(2)(A), an individual debtor may not discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

156.    Other than Eliya and Crespin, the Eliya and her entities are conducting business in Colorado.

157.    Eliya used Peak and the Eliya entities as mere instrumentalities for conducting her own affairs; Eliya's personal interests were/are the same as Peak and the Eliya entities; and adhering to corporate entity liability protection would protect Eliya from the fraud she has perpetrated against Peak Creditors.

158.    Eliya treated corporate profits as her own without regard to separate or independent corporate existence in order to perpetrate fraud on, among others, the Peak Creditors.

159.     Upon information and belief, Peak is now insolvent due to Eliya's management and the Eliya's fraudulent financial practices.

160.     The Peak Creditors have been damaged accordingly in an amount to be determined at trial.

161.     This claim was already asserted in Denver District Court, Case No. 2018CV034332.

162.     In fact, all of the above claims were already plead and asserted in Denver District Court, Case No. 2018CV034332 and later mutually transferred to arbitration at the Judicial Arbiter Group and are currently pending and have not been resolved.

WHEREFORE, Plaintiffs the Peak Creditors pray for an order determining:

1.     Declare and adjudge that any claim of the Peak Creditors for recovery of losses incurred by them through Eliya's fraudulent actions, both as alleged herein and for any other breaches, are exempt from discharge pursuant to 11 U.S.C. § 523(a)(4).

2.     Declare and adjudge that Peak Creditors are awarded their attorneys fees and costs.

3.     Award such other relief as is just and equitable.

DATED:  October 20, 2020.

Respectfully Submitted,

MONTGOMERY LITTLE & SORAN, P.C.

By: /s/ *Debra Piazza*_____
    Debra Piazza
    Attorney for Plaintiffs:
    MONTGOMERY, LITTLE & SORAN, P.C.
    5445 DTC Parkway, Suite 800
    Greenwood Village, Colorado 80111
    T: 303.773.8100
    F: 303.220.0412
    E-mail:  dpiazza@montgomerylittle.com